[This opinion has been published in *Ohio Official Reports* at 78 Ohio St.3d 333.]

THE STATE EX REL. MARTIN PAINTING & COATING COMPANY, APPELLANT AND CROSS-APPELLEE, v. INDUSTRIAL COMMISSION OF OHIO; MARCUM ET AL., CROSS-APPELLANTS AND APPELLEES.

[Cite as *State ex rel. Martin Painting & Coating Co. v. Indus. Comm.*, 1997-Ohio-45.]

*Workers' compensation—Violation of specific safety requirement—All reasonable doubts concerning the interpretation of a safety standard are to be construed against its applicability to the employer—Recalculation of award—Award to widow-claimant must be based on violations committed against her decedent only.*

(No. 94-2727—Submitted February 18, 1997—Decided May 7, 1997.)

Appeal and Cross-Appeals from the Court of Appeals for Franklin County, Nos. 93AP-1092 and 93AP-1093.

———————————

{¶ 1} Donald Marcum and Damon L. Rinehart were employed by appellant and cross-appellee, Martin Painting & Coating Company. On November 14, 1988, the two men began a new assignment—painting an oil storage tank at the Sun Refining and Marketing Company. By the end of the day both men were dead, killed when the scaffold on which they were working fell approximately forty-five feet to the ground. There were no witnesses to the accident.

{¶ 2} The Industrial Commission of Ohio allowed death claims on behalf of both decedents. The widow-claimants, who are cross-appellants in this action, applied for additional compensation, alleging that Martin had violated several specific safety requirements ("VSSR"). Information elicited through investigation and hearing established that on the date of the accident, decedents were painting the upper side-portions of the refinery tank using a powered swing stage

(suspension) scaffold. The scaffold was purchased in 1986 or 1987 from its manufacturer, the Hi-Lo Company. The scaffold consisted of (1) an aluminum platform measuring eighteen feet long by twenty inches wide, (2) a forty-two inch high guardrail, and (3) two power stirrups.

{¶ 3} The scaffold was anchored by two outriggers—fifteen-foot metal beams that rested on the tank's roof and extended over its edge. Five-sixteenths inch steel rope connected the platform to the outriggers. The scaffold's suspension operated on a basic fulcrum principle—there must be sufficient counterweight on the structure-based end of the outrigger to keep the scaffold from tipping the outrigger. The applicable manufacturer's specifications stated that in order to safely anchor the suspended scaffold, "[o]utriggers from which the supporting rope is hung are to be securely tied back to the building as well as having the proper amount of counterweights." Elsewhere, the specifications mandated:

"8. All * * * outriggers and anchoring devices must be tied back at right angles to the face of the building and tautly secured to a structurally sound portion of the building.

"9. Counterweights must be made of a non-flowable material and be securely attached to the rear of the outrigger."

{¶ 4} Calculating the amount of necessary counterweight is complex, taking into account such things as suspended weight, overhang requirements and cable angles. On the date of accident, the total suspended load was estimated at 1,100 pounds. Hal I. Dunham, a registered professional engineer, estimated that, in this case, 450 pounds of counterweight per outrigger were necessary. An alternate calculation, based on different scaffold positioning, set the amount at 300 pounds per outrigger.

{¶ 5} An inspector for the Occupational Safety and Health Administration ("OSHA") who viewed the accident site the day after the accident found that only

100 pounds of counterweight had been attached to each outrigger. He also found no evidence that tiebacks had been used to secondarily secure the equipment.

{¶ 6} A commission staff hearing officer granted the VSSR applications in separate orders containing identical findings:

"* * * [T]he claimant's injury was the result of [the] employer's failure to supply sufficient sound anchorage for scaffolds capable of carrying four times its maximum load and [the employer's] failure to provide tiebacks as an additional means of anchorage as required by [Ohio Adm. Code] 4121:1-3-10(C)(1) [and] (2) and (K)(5), (6) and (8), [in] the Code of Specific Requirements of the Industrial Commission relating to general requirements for all scaffolds and two point suspension scaffolds (swinging scaffolds).

"It is therefore ordered that an additional award of compensation be granted to the claimant in the amount of 50 per cent of the maximum weekly rate * * *.

"* * *

"* * * [Ohio Adm. Code] 4121:1-3-10(C)(1) [and] (2) require:

"(1) The footing or anchorage for scaffolds shall be sound, rigid, and capable of carrying four times the maximum rated load without settling or displacement. Unstable or loose objects shall not be used to support scaffolds.

"(2) Scaffolds and their components shall be capable of supporting without failure no less than four times the maximum rated load.

"It is further found that the amount of counterweights at the job site on the date of injury were not in compliance with the provisions of the applicable safety regulations. It is specifically found that the 200 pounds of counterweight were insufficient to comply with the requirement of load support which was required to be no less than four times the maximum load. Evidence at the hearing of Professional Engineer, Hal Dunham, calculated the counterweight needed at the supposed accident location (around gauge pipe) to be 450 lbs. per outrigger. The employer only provided 100 pounds per outrigger. Mr. Dunham also stated that if

the scaffold were placed in a location contacting the tank and not the pipe edge[,] it would need 300 lbs. per outrigger or 600 lbs. total.

"It is further found that the employer failed to comply with [Ohio Adm. Code] 4121:1-3-10(K)(5), (6) and (8) which provide the following with respect to 'two point suspension scaffolds (swinging scaffolds)':

"[Ohio Adm. Code 4121:1-3-10(K)(5)] The roof irons or hooks shall be of mild steel, or other equivalent material, of proper size and design, securely installed and anchored. Tiebacks of three-quarter-inch manila rope, or the equivalent, shall serve as an additional means of anchorage, installed at right angles to the face of the building, whenever possible, and secured to a structurally sound portion of the building.

"(6) Two-point suspension scaffolds shall be suspended by wire, synthetic, or fiber ropes capable of supporting no less than six times the maximum rated load. All other components shall be capable of supporting no less than four times the maximum rated load.

"(8) No more than two employees shall be required to be on a two-point suspension scaffold designed for a working load of five hundred pounds, at any time. * * * Each employee shall be protected by an approved safety belt attached to a lifeline. The lifeline shall be securely attached to substantial members of the structure (not scaffold) or to securely rigged lines, which will safely suspend the employee in case of a fall.

"The code in section [K](5) states that tiebacks 'shall serve as an additional means of anchorage.' Further, the employer's witness, William Fowler, admitted on cross-examination that the Hi-Lo Co. stated the need to use 'tiebacks' secondarily and he also stated he recommends their usage when he sells them. He further stated that there should have been tiebacks and especially more counterweights. Further, he stated that the lack of tiebacks was the cause of the accident. The Staff Hearing Officer, therefore, finds that based on all testimony

adduced at the hearing, reading of the Specific Safety Regulations, and Manufacturer's Instructions that the use of tiebacks was strongly recommended as a means to additionally secure the outrigger. It is further found that the lack of tiebacks and insufficient counterweights were the responsibility of the employer to provide as required by O.A.C. 4121:1-3-10(K)(5), (6) and (8).

"The employer through counsel argues that the case of *State ex rel. Frank Brown & Sons, [Inc. v. Indus. Comm.]* 37 Ohio St.2d [*sic,* 3d] 162 [524 N.E.2d 482] (1988), relieves [it] of responsibility in the within case. In *Brown* the principle was that the employer did not have a constant obligation and duty to oversee equipment on the job site. In *Brown* the employer complied essentially by supplying all the necessary equipment and supplies, but an employee removed them thereby causing the accident. In the instant case[,] Martin failed to supply necessary materials, that is[,] the sufficient amount of counterweights and tiebacks. In fact, here the employer, Martin Painting & Coating Co., didn't have a sufficient amount of counterweights for the job. Further there is no proof that either Donald Marcum or Damon Rinehart were [*sic*] ever trained on the way to determine the requisite amount. Had Martin Painting & Coating Co., here, supplied the requisite amount of counterweights and tiebacks, it, according to *Brown*, would not have to watch (constantly surveil) the work location, but Martin Painting & Coating Co. failed to meet this requirement of necessary material and equipment. Thus, these acts (lack of requisite equipment and supplies) were within the control of Martin and as such 'serve [as] the basis for establishing a VSSR violation.' Further, there was no unilateral negligence by either Marcum or Rinehart to preclude the finding of an award. * * *

"The case of *State ex rel. Cotterman v. St. Marys Foundry* (1989) [46 Ohio St.3d 42, 544 N.E.2d 887, syllabus], provides that 'an employer does not escape liability for * * * violation of a specific safety requirement by giving a supervisory employee the responsibility to comply with such safety requirement.' The ultimate

responsibility remains with the employer. Marcum cannot be held to [be] a supervisor, nor can Rinehart as well. Marcum was only the senior man on the job. But he still was not skilled and trained in computing the necessary amount of counterweights and further Martin did not have these available to use. The ultimate responsibility for choosing the necessary and requisite equipment falls with the employer and even the employer's field supervisor often relied on the expertise of the manufacturer's representative. Thus, the ultimate responsibility still falls on the employer who failed to comply with the specific safety requirement."

{¶ 7} Further rehearing was denied as follows:

"It is hereby ordered that the employer's motion for rehearing filed April 6, 1992 be denied. The employer has not submitted any new and relevant evidence nor has the employer shown that the order of July 18, 1991 was based on an obvious mistake of fact.

"[1] The Hearing Officer's finding that 200 pounds of counterweights found at the job site [are] insufficient to meet the standards of [Ohio Adm. Code] 4121:1-3-10(C)(1)[and](2) was a correct finding. While it is true * * * 800 pounds of counterweights were available for use at the job site, the employer did state that the 200 pounds that decedents took out to the work site [were] double checked by them and not objected to. Therefore, * * * the employer by double checking and approving only 200 pounds of counterweights [to be] taken to the work site[,] thereby authorized only 200 pounds of counterweights to be used by the decedents and cannot now claim that the finding of 200 pounds of counterweights supplied by the employer to the job site was incorrect.

"[2] The Hearing Officer also found that the decedents were not skilled or trained in computing the correct amount of counterweights to be used [and this] was also a correct finding. In page 136 of the transcript, the employer admitted that [it] did not give [its] employees actual shop training in how to accurately calculate the correct amount of counterweights to be used. The mere attendance at safety

meetings by the decedents without this type of specific training would mean that the decedents were never specifically trained how to determine the correct amount of counterweights that were to be used. * * *

"[3] Additionally, the finding that there was a lack of tiebacks was not mistaken. The employer's argument that tiebacks on the roof could have been used [illegible] refers to excess rope from lifelines and excess rope from lifelines would not be the same as separate secure tiebacks and cannot qualify as such. Also, the employer's assertion that [Ohio Adm. Code] 4121:1-3-10(K)(5) doesn't apply to outriggers is a legal issue and per [Ohio Adm. Code] 4121:1-3-20(G) [*sic,* 4121-3-20(G)] only mistakes of 'fact' can be addressed in a rehearing motion.

"The employer further challenged the Hearing Officer's finding that one of the decedents, Mr. Marcum, was not a supervisor. While Mr. Marcum may have technically been a supervisor (foreman) at the time of the injury, this apparent error would not, as employer alleges, mean that the decedents were guilty of unilateral negligence pursuant to the case of *State ex rel. Frank Brown & Sons v. Indus. Comm.*, 37 Ohio St.3d 1962 [*sic,* 162] (1988), based on the decedents['] error in incorrectly calculating the amount of counterweights needed to be used at the work site.

"As the Hearing Officer correctly stated, a supervisor's negligence in failing to comply with a safety standard (as was the case here) does not relieve the employer of the responsibility to comply with the applicable safety standard. Therefore, whether or not Mr. Marcum was a supervisor would not have affected the VSSR liability in this case.

"Finally, the employer raises an issue with regard to the Hearing Officer's finding that [Ohio Adm. Code] 4121:1-3-10(K)(8) was violated. The employer's argument that this rule was found violated because neither of the decedents were [*sic*] using a safety belt is not actually stated in the order and therefore it would be

improper to make a determination that [illegible] apparent conclusion was somehow invalid when in fact that conclusion does not appear in the order."

{¶ 8} Martin filed a complaint in mandamus in the Court of Appeals for Franklin County, alleging that the commission abused its discretion in awarding VSSR compensation. The court of appeals upheld the violations of Ohio Adm. Code 4121:1-3-10(C)(1) and (2), and 4121:1-3-10(K)(5). It vacated the violations of Ohio Adm. Code 4121:1-3-10(K)(6) and (8). It also ordered recalculations of the amount of the award.

{¶ 9} This cause is now before this court upon an appeal and cross-appeals as of right.

*Buckingham, Doolittle & Burroughs, Brett L. Miller* and *Richard A. Hernandez*, for appellant and cross-appellee.

*James L. Mackin* and *Patrick J. Piccininni*, for cross-appellant and appellee Shangrila Marcum.

*Handelman & Kilroy* and *Robert K. Handelman*, for cross-appellant and appellee Stephanie Rinehart.

––––––––––––––––––––

*Per Curiam.*

{¶ 10} Martin denies that it violated Ohio Adm. Code 4121:1-3-10(C)(1) and (2), or 4121:1-3-10(K)(5). The widow-claimants disagree, and assert further violations of Ohio Adm. Code 4121:1-3-10(K)(6) and (8). They alternately dispute the necessity of award recalculation. For the reasons to follow, we affirm the judgment of the court of appeals in its entirety.

{¶ 11} Ohio Adm. Code 4121:1-3-10(C)(1) and (2) state:

"(1) The footing or anchorage for scaffolds shall be sound, rigid, and capable of carrying four times the maximum rated load without settling or displacement. * * *

"(2) Scaffolds and their components shall be capable of supporting without failure no less than four times the maximum rated load."

{¶ 12} The commission found that the unavailability of sufficient counterweight violated these sections. Martin stresses the commission's responsibility to strictly construe specific safety requirements in the employer's favor (*State ex rel. Burton v. Indus. Comm.* [1989], 46 Ohio St.3d 170, 545 N.E.2d 1216), and argues that because neither provision mentions counterweight, the commission abused its discretion in finding VSSRs. This argument fails.

{¶ 13} While neither section expressly discusses counterweight, both sections do require that the equipment support four times the maximum rated load. For the equipment to do so, the manufacturer's specifications demand that "[o]utriggers from which the supporting rope is hung are to be securely tied back to the building as well as having the proper amount of counterweights." Thus, for this particular scaffold, implicit in the satisfaction of this requirement is adequate counterweight. The commission did not, therefore, abuse its discretion in so holding.

{¶ 14} Martin alternately argues that adequate counterweights were available but were ignored by decedents. Citing *State ex rel. Frank Brown & Sons, Inc. v. Indus. Comm.* (1988), 37 Ohio St.3d 196, 524 N.E.2d 482, Martin argues that this is an act of unilateral negligence by the decedents that negates a violation by Martin. This assertion also fails.

{¶ 15} *Brown* applies only where an otherwise complying device is rendered noncompliant by deliberate claimant action. In this case, there is "some evidence" that there was not sufficient counterweight on site to have ever rendered the scaffold compliant. Engineer Dunham estimated the necessary amount of counterweight at a minimum of six hundred pounds. Again, only two hundred pounds of counterweight were found at the job site.

**{¶ 16}** Martin's position is further undermined by *State ex rel. Cotterman v. St. Marys Foundry* (1989), 46 Ohio St.3d 42, 544 N.E.2d 887. There, two foundry employees were cleaning a suspended, two-and-one-half-ton core. During this process, two chain hooks failed, causing the core to fall upon, and kill, one of the employees.

**{¶ 17}** Investigation revealed that the suspension chains used for that job had a cumulative load capacity of only four thousand pounds. Attempting to avoid VSSR liability, the employer argued that the accident was caused not by the employer's malfeasance, but by the decedent-supervisor's failure to select available suspension chains capable of holding the core.

**{¶ 18}** We rejected that argument, writing:

"An employer does not escape liability for violation of a specific safety requirement by giving a supervisory employee the responsibility to comply with such safety requirement. Although the record shows that the decedent was a safety-conscious employee who had received safety training, the ultimate responsibility for meeting specific safety requirements remains with the employer.

"* * *

"The ultimate responsibility of providing a safe work environment lies with the employer and it cannot be delegated to a subordinate. In this case, St. Marys Foundry must effectuate some means of accurately and precisely exhibiting the weight of the core and the appropriate chain sling to be used. St. Marys Foundry cannot simply turn this task over to a superintendent to select the right chain sling for each core. Providing a variety of chain slings is insufficient to show compliance with Ohio Adm. Code 4121:1-5-15(D)(2). Hence, St. Marys Foundry has violated the specific safety requirement and appellant is entitled to an additional award for a VSSR." 46 Ohio St.3d at 48, 544 N.E.2d at 892-893.

**{¶ 19}** The present case is even more compelling, for not only did Martin delegate counterweight selection to its employees, but it did so without instructing

10

employees in the proper computation, as evidenced by an exchange between claimant Rinehart's counsel and Randy Bush, Martin's field supervisor:

"Q. [Claimant's counsel]: So I gather you rely on your employees to sort of use their collective experience and wisdom in trying to figure out how much counterweight was appropriate for a given job?

"A. [Bush]: We have discussions, and rely on experience, yes.

"Q. [Counsel]: You don't give them any actual shop training for sitting down with any calculators, the way we do, or an engineer did, or Mr. Fowler does, and try to figure out how much actual weight should be on the outriggers; correct?

"A. [Bush]: We don't do that, actually * * *."

{¶ 20} As engineer Hal Dunham's testimony demonstrated, counterweight calculation is very complex. Randy Bush admitted that even after twenty-four years with the company, he could not perform the counterweight computation. Thus cognizant of the formula's complexity, Martin nevertheless left it to the two decedents—neither of whom apparently finished high school—to make an on-the-spot determination as to the necessary amount of counterweight. Unfortunately, in this instance, their estimate was wrong.

{¶ 21} Martin additionally asserts that the commission treated Ohio Adm. Code 4121:1-3-10(C)(1) and (2) as identical, resulting in an impermissible double penalty for the same infraction. We are unpersuaded by this argument.

{¶ 22} The same deficiency did generate two violations. Ohio Adm. Code 4121:1-3-10(C)(1) requires that "footing or anchorage for scaffolds" hold four times the maximum rated load. Section (C)(2) makes the same demand of "scaffolds and their components." No one seriously disputes that the accident was caused by the outriggers' inability to support four times the maximum rated load. Because an outrigger qualifies as both Section (C)(1) "anchorage" and a "scaffold component" under Section (C)(2), two violations were found.

{¶ 23} Martin challenges the permissibility of this result, without offering much support for its position. Martin argues that the commission's interpretation of these provisions violates the directive to strictly interpret specific safety requirements in the employer's favor. This assertion is tenuous, for Martin seems to equate strict construction with a finding of the provisions' inapplicability. It ignores that strict construction does not always demand a finding that no violation occurred. In this case, there is little question that outriggers constitute both anchorage and a scaffold component.

{¶ 24} While there are no cases that address Martin's argument as specifically phrased, our review nevertheless disfavors the employer's position. *State ex rel. Smith v. Huguelet* (1991), 57 Ohio St.3d 1, 564 N.E.2d 698, has already upheld the commission's right to find that a single accident encompassed multiple VSSRs. This, in turn, sets the stage for some overlap in terms of violations found, as *State ex rel. Winzeler Excavating Co. v. Indus. Comm.* (1992), 63 Ohio St.3d 290, 586 N.E.2d 1087, demonstrates.

{¶ 25} A Winzeler employee died when a sewer trench collapsed. Investigation determined that the cave-in resulted from the employer's failure to brace or shore the trench. Two VSSRs were alleged. The first, Ohio Adm. Code 4121:1-3-13(E)(1) provided:

"The wall and faces of all excavations in which employees are exposed to danger from moving ground shall be guarded by a shoring system, sloping of the ground, or some other equivalent means. * * *"

{¶ 26} Ohio Adm. Code 4121:1-3-13(E)(7) also demanded:

"If it is necessary to place or operate power shovels, derricks, trucks, materials or other heavy objects on a level above and near an excavation, the site of the excavation shall be sheet-piled, shored, braced or sloped as necessary to resist the extra pressure due to such superimposed loads."

**{¶ 27}** The commission found violations of both sections and we agreed, despite the fact that the same deficiency—inadequate shoring—underlay both violations. The commission's assessment in this case is not without precedent, and, as such, we find that the commission did not abuse its discretion in finding violations of Ohio Adm. Code 4121:1-3-10(C)(1) and (2).

**{¶ 28}** Martin also contests the commission's determination that the requirement of Ohio Adm. Code 4121:1-3-10(K)(5) was not met. That section reads:

"The roof irons or hooks shall be of mild steel, or other equivalent material, of proper size and design, securely installed and anchored. Tiebacks of three-quarter-nch manila rope, or the equivalent, shall serve as an additional means of anchorage, installed at right angles to the face of the building, whenever possible, and secured to a structurally sound portion of the building."

**{¶ 29}** At issue is the section's second sentence. According to engineer Hal Dunham, a tieback is "a rope or cable that connects to the outrigger. There is an I-bolt, and this outrigger had an eyebolt for attachments, and the cable runs in the opposite direction from where the platform is, and secures to an object on the building or structure you are working on."

**{¶ 30}** The manufacturer's specifications for the scaffold in question called for a minimum five-sixteenths-inch wire rope with a breaking strength of 8,060 pounds.

**{¶ 31}** It is undisputed that the outriggers were not tied back. Martin concedes that the accident would not have occurred if tiebacks had been used. It instead argues that Ohio Adm. Code 4121:1-3-10(K)(5) does not apply. Alternatively, it claims that even if applicable, tiebacks were available, but were not used by the decedents. Neither argument has merit.

**{¶ 32}** Citing Section (K)(5)'s lead sentence, Martin asserts that under the doctrine of strict construction, tiebacks are only necessary when a scaffold is

secured by roof hooks or irons. Since this scaffold employed an outrigger system rather than hooks, Martin maintains that the provision does not apply. We disagree.

**{¶ 33}** There is nothing to indicate that the second sentence is dependent upon the first. Martin's proposed interpretation suggests a result that seems both inconceivable and unacceptable—that the Aministrative Cde's authors intended to extend secondary safety coverage of Section (K)(5) to some, but not all, scaffold employees.

**{¶ 34}** It is within this context that we find the strongest rationale for affirming the commission. Strict construction requires that "all reasonable doubts concerning the interpretation of the safety standard are to be construed against its applicability to the employer." ( Emphasis added.) *Burton,* 46 Ohio St.3d at 172, 545 N.E.2d at 1219. We find that it would be underreasonable to assume that the regulators intended to free employers from providing tiebacks for scaffolds supported by outriggers as opposed to hooks. Such reasoning is even more compelling when one considers that on four separate occasions the manufacturer's specifications mandate that outriggers be tied back. The commission's interpretation of Ohio Adm. Code 4121:1-3-10(K)(5) as encompassing all scaffolds was not, therefore, an abuse of discretion.

**{¶ 35}** Assuming *arguendo* the applicability of Ohio Adm. Code 4121:1-3-10(K)(5), Martin again asserts that the required equipment was available but was ignored by the decedents. Again, this contention is unpersuasive.

**{¶ 36}** An inspection performed the day after the accident found no tiebacks at the accident scene. Hal Dunham reached the same conclusion after reviewing OSHA documentation and photographs. Martin responds that there was loose rope on the tank roof that decedents could have used to fashion their own tiebacks. The manufacturer's specifications, however, contradict the assertion that just any rope could be used as a tieback. To the contrary, they specify a wire rope of at least five-sixteenths inch with a breaking strength of 8,060 pounds. There is no evidence that

the loose rope met these specifications. The commission, therefore, properly rejected this argument.

**{¶ 37}** Concerning the cross-appeals before us, widow-claimants contest the appellate court's decision to vacate the violations under Ohio Adm. Code 4121:1-3-10(K)(6) and (8). We again affirm the judgment of the court below.

**{¶ 38}** Ohio Adm. Code 4121:1-3-10(K)(6) reads:

"Two-point suspension scaffolds shall be suspended by wire, synthetic, or fiber ropes capable of supporting no less than six times the maximum rated load. All other components shall be capable of supporting no less than four times the maximum rated load."

**{¶ 39}** The court of appeals summed up the violation of Section (K)(6) best:

"There is no evidence in the record that the cables on which the scaffold was suspended contributed to the accident. The cables from which the scaffold was suspended were simply never an issue in this case." (Emphasis added.) Unsecured outriggers, not defective cables, caused the accident. As such, the court below correctly vacated this VSSR.

**{¶ 40}** The remaining regulation, Ohio Adm. Code 4121:1-3-10(K)(8), states:

"* * * Each employee shall be protected by an approved safety belt attached to a lifeline. The lifeline shall be securely attached to substantial members of the structure (not scaffold) or to securely rigged lines, which will safely suspend the employee in case of a fall."

**{¶ 41}** The commission found a Section (K)(8) violation, but offered no evidence or explanation in support. Unlike Section (K)(6), however, there is a legitimate issue as to whether Section (K)(8) was satisfied, making a return to the commission for further consideration appropriate.

**{¶ 42}** There is evidence indicating that lifelines were attached to a secured portion of the tank. For reasons unknown, however, decedents had not attached the

lines to their safety belts. If decedents deliberately disregarded the lifelines, VSSR liability may be inappropriate. See *Kale v. Indus. Comm.* (May 3, 1984), Franklin App. No. 83AP-968, unreported. If, however, there were other reasons for the failure to wear those lines, an additional award may be proper. The issue, therefore, warrants a return to the commission for further exploration.

{¶ 43} Turning to the final proposition raised, award recalculation, we note that among the factors considered in determining the amount of a VSSR award are the seriousness and number of violations. In this case, the commission's award was premised on five violations. Litigation has since reduced that number to three, possibly two, violations. This reduction merits award recalculation.

{¶ 44} The widow-claimants argue that regardless of the number of violations ultimately found, the fact that two people died justifies the present high award. This assertion is unpersuasive. This was unquestionably a very tragic incident. However, neither of the surviving widows may capitalize on the death of the other's decedent in order to enhance her individual award. Each award to a widow-claimant must be based on the violations committed against her decedent only.

{¶ 45} The judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

_____